ANDREW J. SHAMIS
(AZ Bar No. 037343)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
ashamis@shamisgentile.com

A. BROOKE MURPHY*
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
Telephone: (405) 389-4989
abm@murphylegalfirm.com

Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
raina@straussborrelli.com

**Pro Hac Vice* application pending

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

DYLAN CAIN, JOHN COVINGTON, STEVEN SWINNERTON, and SERGIO VILLAR, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BARRETT-JACKSON HOLDINGS, LLC,

Defendant.

Case No.: 2:25-CV-03270-PHX-MTL

CONSOLIDATED CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs Dylan Cain, John Covington, Steven Swinnerton, and Sergio Villar ("Plaintiffs"), individually and on behalf of all others similarly situated, and on behalf of the general public, bring this Class Action Complaint, against defendant Barrett-Jackson Holdings, LLC (referred to herein as "Barrett-Jackson" or "Defendant") based on personal knowledge and the investigation of counsel, and alleges as follows:

## I. INTRODUCTION

1. With this action, Plaintiffs seek to hold Defendant responsible for the harms it caused Plaintiffs and thousands of other similarly situated persons in the preventable data breach of Defendant's inadequately protected computer network.

2. On or around November 25, 2024, Barrett-Jackson Holdings, LLC ("Barrett-Jackson" or "Defendant") became aware of suspicious activity on its computer systems, indicating a data breach. Based on a subsequent forensic investigation, Barrett-Jackson determined that cybercriminals infiltrated its inadequately secured computer network on or around November 25, 2024, and copied certain files containing the personal information of Plaintiffs and Class Members ("Data Breach" or "Breach").[1]

3. According to Barrett-Jackson's public regulatory filings, the personal information accessed by cybercriminals during the Data Breach included the names, Social Security numbers, financial account information, credit/debit card information, driver's license information, and health insurance information ("PII" or "Personal Information") of Plaintiffs and the Class.[2]

4. It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby

---

[1] *See* Defendant's Breach Letter ("Breach Letter"), available at: https://ago.vermont.gov/sites/ago/files/documents/2025-07-31%20Barrett-Jackson%20Holdings%20Data%20Breach%20Notice%20to%20Consumers.pdf

[2] *See e.g.* https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage.

allowing cybercriminals unrestricted access to its current and former customers' and employees' PII.

5. Plaintiffs are current and former employees and customers of Defendant.

6. As part of its business, and in order to gain profits, Defendant obtained and stored the PII of Plaintiffs and Class Members.

7. By taking possession and control of Plaintiffs' and Class Members' Personal Information, Defendant assumed a duty to securely store and protect the Personal Information of Plaintiffs and the Class.

8. Defendant breached this duty and betrayed the trust of Plaintiffs and Class Members by failing to properly safeguard and protect their Personal Information, thus enabling cyber criminals to access, acquire, appropriate, compromise, disclose, encumber, exfiltrate, release, steal, misuse, and/or view it.

9. Defendant's misconduct – failing to timely implement adequate and reasonable measures to protect Plaintiffs' and Class Members' Personal Information, failing to timely detect the Data Breach, failing to take adequate steps to prevent and stop the Data Breach, failing to disclose the material facts that it did not have adequate security practices in place to safeguard the Personal Information, and failing to provide timely and adequate notice of the Data Breach – caused substantial harm and injuries to Plaintiffs and Class Members across the United States.

10. Due to Defendant's negligence and failures, cyber criminals obtained and now possess everything they need to commit personal and medical identity theft and wreak havoc on the financial and personal lives of thousands of individuals, for decades to come.[3]

11. Plaintiffs bring this class action lawsuit to hold Defendant responsible for its grossly negligent—indeed, reckless—failure to use statutorily required or reasonable industry cybersecurity measures to protect Class Members' Personal Information.

---

[3] *See* https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (showing that the Data Breach affected 6,081 Texas residents).

12. Because Defendant presented such a soft target to cyber criminals, Plaintiffs and Class Members have already been subjected to violations of their privacy, fraud, and identity theft, or have been exposed to a heightened and imminent risk of certainly impending fraud and identity theft.

13. Thus, as a result of the Data Breach, Plaintiffs and Class Members have already suffered damages. For example, now that their Personal Information has been released into the criminal cyber domains, Plaintiffs and Class Members are at imminent and impending risk of identity theft. This risk will continue for the rest of their lives, as Plaintiffs and Class Members are now forced to deal with the danger of identity thieves possessing and using their Personal Information.

14. Additionally, Plaintiffs and Class Members have already lost time and money responding to and mitigating the impact of the Data Breach, which efforts are continuous and ongoing.

15. As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered actual and present injuries, including but not limited to: (a) present, certainly impending, and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Personal Information; (b) diminution of value of their Personal Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Personal Information; (e) illegal sales of the compromised Personal Information; (f) mitigation expenses and time spent responding to and remedying the effects of the Data Breach; (g) identity theft insurance costs; (h) "out of pocket" costs incurred due to actual identity theft; (i) credit freezes/unfreezes; (j) expense and time spent on initiating fraud alerts and contacting third parties; (k) decreased credit scores; (l) lost work time; and (m) anxiety, annoyance, and nuisance; (n) continued risk to their Personal Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Personal Information.

16. Defendant had and continues to have a duty to adopt reasonable measures to keep Plaintiffs' and Class Members' Private Information confidential and protected from involuntary disclosure to third parties, and to audit, monitor, and verify the integrity of its IT networks, and train employees with access to use adequate cybersecurity measures.

17. Defendant had and continues to have obligations created by the FTC Act, 15 U.S.C. § 45, common law, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and protected from unauthorized disclosure. Defendant failed to do so.

18. Plaintiffs bring this action individually and on behalf of the Class and seek actual damages and restitution. Plaintiffs also seek declaratory and injunctive relief, including significant improvements to Defendant's data security systems and protocols, future annual audits, Defendant-funded long-term credit monitoring services, and other remedies as the Court sees necessary and proper.

## II. THE PARTIES

19. Plaintiff Sergio Villar is a citizen and resident of Arizona.

20. Plaintiff Steven Swinnerton is a citizen and resident of Arizona.

21. Plaintiff Dylan Cain is a citizen and resident of Washington.

22. Plaintiff John Covington is a citizen and resident of Arizona.

23. Defendant is an Arizona limited liability company with its principal place of business located at 15555 N. 79th Place, Suite A, Scottsdale, AZ, 85260. Upon information and belief, all of Defendant's members are domiciled in Arizona.[4]

## III. JURISDICTION AND VENUE

24. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

25. This Court has diversity jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d) because this is a class action involving more

[4] https://ecorp.azcc.gov/PublicBusinessSearch/PublicBusinessInfo?entityNumber=L08017969&__ncforminfo=NoFHjoeYjNfSPymOZYkH8-wYc1fDzTOuXMhsJTYvWfG57-QCdtuTddn56VrpPRpwDe5XLfDTJn2o2QsPblXVZE2u_tcyaxFu

than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and Plaintiffs and members of the Class are citizens of states that differ from Defendant.

26. Class Members, including Plaintiffs, are victims of the Data Breach and are domiciled across the United States.

27. By having at least one "member of a class of Plaintiffs [who] is a citizen of a State different from any defendant," diversity jurisdiction is conferred here, since the matter in controversy exceeds $5,000,000. *See* 28 U.S.C. § 1332(d)(2) (establishing that diversity jurisdiction is conferred where the amount in controversy exceeds $5,000,000 and where "*any* member of a [proposed] class of Plaintiff is a citizen of a State different from *any* defendant") (emphasis added).

28. This Court has personal jurisdiction over Defendant because Defendant conducts business in this District, maintains its principal place of business in this District, and has sufficient minimum contacts this State.

29. Venue is likewise proper as to Defendant in this District under 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is in this District and many of Defendant's acts complained of herein occurred within this District.

## IV. FACTUAL ALLEGATIONS

### A. Defendant Barrett-Jackson Holdings, LLC

30. Barrett-Jackson is an auctioneer of motor vehicles and "produces The World's Greatest Collector Car Auctions in Scottsdale, Arizona, and Palm Beach, Florida, where thousands of the most sought-after, unique and valuable automobiles cross the block in front of a global audience."[5]

31. As part of its business, and in order to gain profits, Defendant obtained and stored the personal information of Plaintiffs and members of the Class to facilitate their employment and/or their conducting business with Defendant.

[5] Company, BARRETT-JACKSON, https://www.barrett-jackson.com/company (last visited Jan. 5, 2026).

32. In exchange for receiving Plaintiffs' and Class Members' Personal Information, Defendant promised to safeguard the sensitive, confidential data and use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

33. The information Defendant held in its computer networks at the time of the Data Breach included the unencrypted Personal Information of Plaintiffs and Class Members.

34. At all relevant times, Defendant knew it was storing and using its networks to store and transmit valuable, sensitive Personal Information belonging to Plaintiffs and Class Members, and that as a result, its systems would be attractive targets for cybercriminals.

35. In an effort to assure customers and employees that Barrett-Jackson is doing all that is necessary and required to protect the confidentiality of their personal information, Defendant purportedly adopted protocols and practices that it represents to customers are followed with respect to their private personal information (the "Privacy Policy").[6]

36. Defendant represents in its Privacy Policy that it obtains and uses personal information to: provide and improve their events, products, and Services; send technical notices and support and administrative messages to customers; communicate with customers about products, services, promotions, events, and other news and information; personalize their Services and events; facilitate contests and promotions and process and deliver prizes; monitor and analyze trends and usage in connection with their services and events; and to detect and prevent fraudulent transactions and other illegal activities and protect the rights and property of Barrett-Jackson and others.[7]

37. Defendant states that it "will also take steps to ensure that the information we collect is treated securely and in accordance with this Privacy Policy, and we have

---

[6] *See* https://www.barrett-jackson.com/privacyPolicy
[7] *Id.*

put in place technical and organizational procedures designed to safeguard the information we collect." It further represents in its Privacy Policy that "[w]e do not keep or use personal information that does not serve our legitimate business purpose and comply with this Privacy Policy."[8]

38. Plaintiffs and Class Members relied on Defendant's promises, expressly worded and implied through its conduct in requiring Plaintiffs and Class Members to provide their Personal Information, to implement reasonable practices to keep their sensitive Personal Information confidential and securely maintained, to use this information for necessary purposes only and make only authorized disclosures of this information, and to delete Personal Information from Defendant's systems when no longer necessary for its legitimate business purposes.

39. Defendant derived economic benefits from collecting Plaintiffs' and Class Members' Personal Information. Without the required submission of Personal Information, Defendant could not perform its operations or provide its revenue-generating services. Additionally, upon information and belief Defendant uses the Personal Information collected from Plaintiffs and Class Members for marketing and fundraising purposes.

**B. The Data Breach and Defendant's Belated Notice**

40. According to Defendant's public disclosures, on or around November 25, 2024, third-party cyber criminals conducted a successful cybersecurity attack whereby they infiltrated Defendant's systems and gained unauthorized access to and copied files containing the Personal Information of thousands of individuals whose data was stored within Defendant's system.[9]

---

[8] *Id.*

[9] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/6a775a28-5b1e-458b-9a20-e967ba1f6077.html

41. Defendant then conducted a review of the filed exfiltrated to determine what information may be affected and to whom it belonged.[10] Defendant's review concluded on or around July 1, 2025.[11]

42. According to Defendant, the Personal Information exposed to and potentially accessed or acquired by cybercriminals included: names, addresses, Social Security Numbers, driver's license numbers, government-issued ID numbers (e.g. passport and state ID cards), financial information (e.g. account number, credit or debit card number), and health insurance information.

43. Defendant began sending a notice via mail to affected individuals on or around July 31, 2025.[12]

44. Despite the sensitivity of the PII that was exposed, and the attendant consequences to affected individuals as a result of the exposure, Defendant failed to disclose the Data Breach for over eight (8) months from the time of the Breach. This inexplicable delay further exacerbated the harms to Plaintiffs and Class members.

45. Based on the Breach Letter received by Plaintiffs, the type of cyberattack involved, and public news reports, it is plausible and likely that Plaintiffs' Personal Information was stolen in the Data Breach.

46. It is apparent from the notice posted on Defendant's website and the Breach Letter sent to Plaintiffs and the Class that the Personal Information contained within Defendant's systems and email accounts was not encrypted.[13]

47. Upon information and belief, the unauthorized third-party cybercriminals gained access to the Personal Information and has engaged in (and will continue to engage in) misuse of the Personal Information, including marketing and selling Plaintiffs' and Class Members' Personal Information on the dark web.

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

48. Accordingly, Defendant had obligations created by industry standards, common law, statutory law, and its own assurances and representations to keep Plaintiffs' and Class Members' Personal Information confidential and to protect such Personal Information from unauthorized access.

49. Nevertheless, Defendant was negligent and did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing the exposure of Personal Information for Plaintiffs and Class Members.

50. For example, as evidenced by the Data Breach's occurrence, the infiltrated network was not protected by sufficient multi-layer data security technologies or effective firewalls.

51. Similarly, based on the delayed discovery of the Data Breach, it is evident that the infiltrated network, that Defendant allowed to store Plaintiffs' Personal Information, did not have sufficiently effective endpoint detection.

52. Further, the fact that PII was acquired in the Data Breach demonstrates that the PII contained in the Defendant's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

53. The stolen Personal Information at issue has great value to the hackers. Plaintiffs and Class Members entrusted Defendant with sensitive and confidential information, including their PII, which includes information (such as Social Security numbers) that is static, does not change, and can be used to commit a myriad of financial crimes.

### C. Plaintiffs' Experiences

**<u>Plaintiff Sergio Villar</u>**

54. Plaintiff Villar is a former employee of Barrett-Jackson.

55. As a condition of his employment with Defendant, Plaintiff Villar provided Defendant with his Personal Information. Defendant used that Information to facilitate its

employment of Plaintiff Villar, including payroll, and required Plaintiff Villar to provide it in order to obtain employment and payment for that employment.

56. Plaintiff Villar received a Breach Letter from Defendant dated July 31, 2025, informing him that his Personal Information, including his Social Security number, was specifically identified as having been compromised and copied in the Data Breach.

57. Plaintiff Villar's and Class Members' PII was entrusted to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access. Plaintiff Villar also reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of Personal Information.

58. Because of the Data Breach, Plaintiff Villar's Personal Information is now in the hands of cyber criminals. Plaintiff Villar and all Class Members are now imminently at risk of crippling future identity theft and fraud.

59. Plaintiff Villar has a continuing interest in ensuring that his Personal Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

60. Plaintiff Villar greatly values his privacy and Personal Information and takes reasonable steps to maintain the confidentiality of his Personal Information. Plaintiff Villar is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

61. Plaintiff Villar stores any and all documents containing Personal Information in a secure location and destroys any documents he receives in the mail that contain any Personal Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

62. As a result of the Data Breach, Plaintiff Villar has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate,

mitigate, and address the future consequences of the Data Breach, including investigating the Data Breach, researching how best to ensure that he is protected from identity theft, reviewing account statements and other information, and taking other steps in an attempt to mitigate the harm caused by the Data Breach.

63. Plaintiff Villar took these steps at the direction of Defendant. Defendant's Breach Letter advised recipients "to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."[14] Defendant's Breach Letter further advised Plaintiffs to monitor their accounts, how they could place fraud alerts and freeze their credit profiles, and how to file a complaint their information had been misused with the FTC and various states' Attorney Generals' offices.[15]

64. Plaintiff Villar has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Villar's valuable Personal Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Villar's Personal Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff Villar's Personal Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Villar's Personal Information; and (e) continued risk to Plaintiff Villar's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to Defendant.

[14] *See e.g.* https://ago.vermont.gov/sites/ago/files/documents/2025-07-31%20Barrett-Jackson%20Holdings%20Data%20Breach%20Notice%20to%20Consumers.pdf

[15] *Id.*

**Plaintiff Dylan Cain**

65. Plaintiff Cain is a customer of Defendant.

66. On July 31, 2025, Defendant sent Plaintiff Cain a Breach Letter informing him that his Personal Information was compromised in the Data Breach.

67. Plaintiff Cain reasonably understood and expected that Defendant would safeguard his Personal Information and timely and adequately notify him in the event of a data breach. Plaintiff Cain would not have allowed Defendant, or anyone in Defendant's position, to maintain his Personal Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access. Plaintiff Cain also reasonably understood that a portion of the funds derived from his transactions with Defendant would be used to pay for adequate cybersecurity and protection of his Personal Information.

68. Plaintiff Cain greatly values his privacy and Personal Information and takes reasonable steps to maintain the confidentiality of his Personal Information. Plaintiff Cain is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

69. Plaintiff Cain stores any and all documents containing Personal Information in a secure location and destroys any documents he receives in the mail that contain any Personal Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

70. As a result of the Data Breach, Plaintiff Cain has spent considerable time researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff Cain spent at Defendant's direction and that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

71. Plaintiff Cain took these steps at the direction of Defendant. Defendant's Breach Letter advised recipients "to remain vigilant against incidents of identity theft and

fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."[16] Defendant's Breach Letter further advised Plaintiffs to monitor their accounts, how they could place fraud alerts and freeze their credit profiles, and how to file a complaint their information had been misused with the FTC and various states' Attorney Generals' offices.[17]

72. As a consequence of and following the Data Breach, Plaintiff Cain has experienced a significant uptick in spam calls.

73. The Data Breach has caused Plaintiff Cain to suffer fear, anxiety, and stress.

74. Plaintiff Cain has a continuing interest in ensuring that his Personal Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

75. Following the Data Breach, Plaintiff Cain was notified by Experian that his Personal Information is now available on the dark web. This has caused Plaintiff Cain to suffer great anxiety knowing that his private, sensitive information is now readily available to cybercriminals and others.

76. As a result of the Data Breach, Plaintiff Cain has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including investigating the Data Breach, researching how best to ensure that he is protected from identity theft, reviewing account statements and other information, and taking other steps in an attempt to mitigate the harm caused by the Data Breach.

77. Plaintiff Cain has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Cain's valuable Personal Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Cain's Personal Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff Cain's Personal Information that was

---

[16] *See e.g.* https://ago.vermont.gov/sites/ago/files/documents/2025-07-31%20Barrett-Jackson%20Holdings%20Data%20Breach%20Notice%20to%20Consumers.pdf

[17] *Id.*

entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Cain's Personal Information; and (e) continued risk to Plaintiff Cain's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to Defendant.

**Plaintiff Steven Swinnerton**

78. Plaintiff Steven Swinnerton is a former employee of Defendant.

79. On July 31, 2025, Defendant sent Plaintiff Swinnerton a Breach Letter informing him that his Personal Information was compromised in the Data Breach.

80. As a condition of his employment with Defendant, Plaintiff Swinnerton provided Defendant with his Personal Information. Defendant used that Information to facilitate its employment of Plaintiff Swinnerton, including payroll, and required Plaintiff Swinnerton to provide it in order to obtain employment and payment for that employment.

81. Plaintiff Swinnerton is very careful about the privacy and security of his Personal Information. He does not knowingly transmit his Personal Information over the internet in an unsafe manner. He is careful to store any documents containing his Personal Information in a secure location.

82. Plaintiff Swinnerton provided his Personal to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiffs' Personal Information and has a continuing legal duty and obligation to protect that Information from unauthorized access and disclosure.

83. Plaintiff Swinnerton reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of his Personal Information.

84. On information and belief, Plaintiff Swinnerton's Personal Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

85. Following the Data Breach, Plaintiff Swinnerton has suffered from a spike in spam and scam emails, text messages and phone calls.

86. Plaintiff Swinnerton fears for his personal financial security and worries about what information was exposed in the Data Breach.

87. Because of Defendant's Data Breach, Plaintiff Swinnerton has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Swinnerton's injuries are precisely the type of injuries that the law contemplates and addresses.

88. Plaintiff Swinnerton has a continuing interest in ensuring that his Personal Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

89. Plaintiff Swinnerton greatly values his privacy and Personal Information and takes reasonable steps to maintain the confidentiality of his Personal Information. Plaintiff Swinnerton is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

90. Plaintiff Swinnerton stores any and all documents containing Personal Information in a secure location and destroys any documents he receives in the mail that contain any Personal Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

91. As a result of the Data Breach, Plaintiff Swinnerton has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including investigating the Data Breach, researching how best to ensure that he is protected from identity theft, reviewing account statements and other information, and taking other steps in an attempt to mitigate the harm caused by the Data Breach.

92. Plaintiff Swinnerton took these steps at the direction of Defendant. Defendant's Breach Letter advised recipients "to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."[18] Defendant's Breach Letter further advised Plaintiffs to monitor their accounts, how they could place fraud alerts and freeze their credit profiles, and how to file a complaint their information had been misused with the FTC and various states' Attorney Generals' offices.[19]

93. Plaintiff Swinnerton has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Swinnerton's valuable Personal Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Swinnerton's Personal Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff Swinnerton's Personal Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Swinnerton's Personal Information; and (e) continued risk to Plaintiff Swinnerton's Personal Information, which remains in the possession of Defendant and which is subject to further

---

[18] *See e.g.* https://ago.vermont.gov/sites/ago/files/documents/2025-07-31%20Barrett-Jackson%20Holdings%20Data%20Breach%20Notice%20to%20Consumers.pdf

[19] *Id.*

breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to Defendant.

**Plaintiff John Covington**

94. Plaintiff Covington was required to provide and did provide his PII to Defendant as a condition of receiving services from Defendant.

95. To date, Defendant has done next to nothing to adequately protect Plaintiff Covington and Class Members, or to compensate them for their injuries sustained in this Data Breach particularly given the fact that Plaintiff Covington's PII has already been "impacted" in the Data Breach and likely been made available on the dark web to anyone wishing to purchase it.

96. The fraud and identity monitoring services offered by Defendant places the burden squarely on Plaintiff Covington and Class Members by requiring them to expend time signing up for the service.

97. Nor has Defendant compensated Plaintiff Covington and Class Members for the time they will spend monitoring their accounts, placing credit freezes and fraud alerts, changing online passwords and other actions.

98. Plaintiff Covington and Class Members have been further damaged by the compromise of their PII in the Data Breach which was "impacted" and is in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

99. Plaintiff Covington typically takes measures to protect his PII and is very careful about sharing his PII. Plaintiff has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

100. Plaintiff Covington stores any documents containing his PII in a safe and secure location, and he diligently chooses unique usernames and passwords for his online accounts.

101. As a result of the Data Breach, Plaintiff Covington has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related

to this Data Breach. In response to the Data Breach, Plaintiff Covington has spent significant time monitoring his accounts and credit score, changing his online account passwords and verifying the legitimacy of the Notice and researching the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

102. Plaintiff Covington also suffered actual injury in the form of damages to and diminution in the value of his PII — a form of intangible property that he entrusted to Defendant for the purpose of receiving services from Defendant, which was compromised in and as a result of the Data Breach.

103. Plaintiff Covington has also experienced an increase in spam emails since the disclosure of his PII.

104. Plaintiff Covington suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy, especially after her information was used multiple times by unauthorized individuals.

105. Plaintiff Covington suffered emotional distress and increased stress and anxiety as a result of the Data Breach because of the actions he has been forced to undertake, the loss of control over his most intimate information, and the fact that he must remain vigilant for the remainder of his life.

106. Plaintiff Covington has suffered imminent and impending injury arising from not only the increased risk, but also the existence of fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

107. Defendant obtained and continues to maintain Plaintiff Covington's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Defendant required the PII from Plaintiff Covington as a condition of receiving services from Defendant. Plaintiff Covington, however, would not have entrusted his PII to Defendant had he known that it would fail to maintain adequate data security. Plaintiff Covington's PII was compromised and disclosed as a result of the Data Breach.

108. As a result of the Data Breach, Plaintiff Covington anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Covington is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### D. Defendant had an Obligation to Protect Personal Information under the Law and the Applicable Standard of Care

109. Defendant is prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

110. Defendant is further required by various states' laws and regulations to protect Plaintiffs' and Class Members' Personal Information.

111. Defendant owed a duty to Plaintiffs and the Class to design, maintain, and test its computer and application systems to ensure that the Personal Information in its possession was adequately secured and protected.

112. Defendant owed a duty to Plaintiffs and the Class to create and implement reasonable data security practices and procedures to protect the Personal Information in its possession, including adequately training its employees (and others who accessed Personal Information within its computer systems) on how to adequately protect Personal Information.

113. Defendant owed a duty to Plaintiffs and the Class to implement processes that would detect a breach on its systems in a timely manner.

114. Defendant owed a duty to Plaintiffs and the Class to act upon data security warnings and alerts in a timely fashion.

115. Defendant owed a duty to Plaintiffs and the Class to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Personal Information from theft because such an inadequacy would be a material fact in the decision to entrust Personal Information with Defendant.

116. Defendant owed a duty to Plaintiffs and the Class to disclose in a timely and accurate manner when the Data Breach occurred.

117. Defendant owed a duty of care to Plaintiffs and the Class because it was a foreseeable victim of a data breach.

### E. Consumers Prioritize Data Security

118. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[20] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[21]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[22]

c. 89% of consumers stated that "I care about data privacy."[23]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[24]

---

[20] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Jan. 5, 2026).
[21] *Id*. at 3.
[22] *Id*.
[23] *Id*. at 9.
[24] *Id*.

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[25]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[26]

### F. Defendant was on Notice of Cyber Attack Threats and of the Inadequacy of their Data Security

119. Because Defendant had a duty to protect Plaintiffs' and Class Members' Personal Information, Defendant should have known through readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

120. Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[27] Yahoo,[28] Marriott International,[29] Chipotle, Chili's, Arby's,[30] and others.[31]

121. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks because warnings were readily available and accessible via the internet.

122. In 2023, an all-time high for data compromises occurred, with 3,205

---

[25] *Id.*

[26] *Id.* at 11.

[27] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[28] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[29] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[30] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[31] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

compromises affecting 353,027,892 total victims.[32] The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.[33] The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.[34]

123. These numbers held steady in 2024. In 2024, 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year. [35]

124. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[36]

125. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[37]

---

[32] *See 2023 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2024); https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf. (last visited Jan. 5, 2026).

[33] *Id.*

[34] *Id.*

[35] *2024 Data Breach Report*, ITRC (Identity Theft Resource Center) (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last accessed Jan. 5, 2026).

[36] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), available at https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed Jan. 5, 2026).

[37] U.S. CISA, Ransomware Guide – September 2020, available at https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf (last accessed Jan. 5, 2026).

126. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting big companies such as Defendant, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant sensitive information such as Defendant, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

127. Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Personal Information could be accessed, exfiltrated, and published as the result of a cyberattack.

128. Defendant should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Personal Information that it collected and maintained.

129. Defendant was also on notice of the importance of data encryption of Personal Information. Defendant knew it kept Personal Information in its systems and yet it appears Defendant did not encrypt these systems or the information contained within them.

**G. The Data Breach Was Preventable**

130. By obtaining, collecting, and storing the Personal Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Personal Information from disclosure.

131. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[38]

132. To prevent and detect ransomware attacks, Defendant could and should have

---

[38] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed Jan. 5, 2026).

implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute

programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[39]

133. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks. . . .

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net). . . .

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your Personal Information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it. . . .

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity

[39] *Id.* at 3-4.

threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic. . . .[40]

134. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; Remove privilege credentials

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full comprise

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords
- Apply principle of least-privilege

**Monitor for adversarial activities**
- Hunt for brute force attempts
- Monitor for cleanup of Event logs
- Analyze logon events

[40] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://www.cisa.gov/news-events/news/protecting-against-ransomware (last accessed Jan. 5, 2026).

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[41]

135. Given that Defendant was storing the Personal Information of other individuals, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

136. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the Personal Information of Plaintiffs and Class Members.

137. Defendant could have prevented this Data Breach by properly securing and encrypting the folders, files, and or data fields containing the Personal Information of Plaintiffs and Class Members. Alternatively, Defendant could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an internet-accessible environment when there was a reasonable need to do so.

138. Defendant's negligence in safeguarding the Personal Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

139. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Personal Information of Plaintiffs and Class Members from being compromised.

140. Defendant disregarded the rights of Plaintiffs and Class Members by recklessly and/or negligently failing to take and implement adequate and reasonable

---

[41] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last accessed Jan. 5, 2026).

measures to ensure that the Personal Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, Plaintiffs' and Class Members' Personal Information was compromised through disclosure to an unknown and unauthorized criminal third party.

141. Upon information and belief, Defendant breached its duties and obligations in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Personal Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack; and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

142. The ramifications of Defendant's failure to secure the Personal Information of Plaintiffs and Class Members are long-lasting and severe. Once Personal Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### H. Cyber Criminals Will Use Plaintiffs' and Class Members' Personal Information to Defraud Them or to Sell on the Dark Web

143. Plaintiffs' and Class Members' Personal Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

144. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[42] For example, with the Personal Information stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[43] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

145. Personal Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[44]

146. For example, it is believed that certain Personal Information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related benefits in the state of Oklahoma.[45]

147. Upon information and belief, this was a financially motivated and targeted Data Breach. The Personal Information exposed in this Data Breach is extraordinarily valuable to identity thieves for use in the kinds of criminal activity described herein.

---

[42] "Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

[43] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[44] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/assets/270/262904.htmlu

[45] *See* https://www.engadget.com/stolen-data-used-for-unemployment-fraud-ring-174618050.html; *see also* https://www.wired.com/story/nigerian-scammers-unemployment-system-scattered-canary/.

148. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[46]

149. Hackers may not use the accessed information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[47]

150. Medical-related identity theft is one of the most common, most expensive, and most difficult to prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013…," which is more than identity thefts involving banking and finance, the government and the military, or education.[48]

151. As indicated by James Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place."[49] A complete identity theft kit that includes health insurance credentials (as was the case for some Plaintiffs and Class Members here) may be worth up to $1,000 on the black market.[50]

---

[46] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[47] *Data Breaches Are Frequent*, *supra* note 11.

[48] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/.

[49] IDExperts, *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, https://www.idexpertscorp.com/knowedge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[50] *Managing cyber risks in an interconnected world*, PRICEWATERHOUSECOOPERS: Key findings from The Global State of Information Security Survey 2015,

152. As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[51]

153. With this Data Breach, identity thieves have already started to prey on the victims, including Plaintiffs, and one can reasonably anticipate this will continue.

154. The Personal Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[52] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[53] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[54]

155. Based on the foregoing, the Personal Information compromised in the Data Breach, which includes Social Security numbers, is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

156. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth

---

https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

[51] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf (last accessed Jan. 5, 2026).

[52] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Jan. 5, 2026).

[53] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Jan. 5, 2026).

[54] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Jan. 5, 2026).

more than 10x on the black market."[55]

157. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

158. One such example of criminals using Personal Information for profit is the development of "Fullz" packages.

159. Cyber-criminals can cross-reference two sources of Personal Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

160. The development of "Fullz" packages means that stolen Personal Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

161. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

162. Victims of the Data Breach, like Plaintiffs and other Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their credit because of the Data Breach.[56]

---

[56] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf (last accessed Jan. 5, 2026).

163. Plaintiffs and Class Members are trying to mitigate the damage that Defendant has caused them but, given the Personal Information Defendant made accessible to hackers, they are certain to incur additional damages. Because identity thieves have their Personal Information, Plaintiffs and all Class Members will need to have identity theft monitoring protection for the rest of their lives.

164. If cyber criminals manage to steal financial information, health insurance information, and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Defendant has exposed the Plaintiffs and Class Members.

165. As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[57]

166. With this Data Breach, identity thieves have already started to prey on the victims, and one can reasonably anticipate this will continue.

167. Victims of the Data Breach, like Plaintiffs and other Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their credit because of the Data Breach.[58]

168. In fact, as a direct and proximate result of the Data Breach, Plaintiffs and the Class have suffered, and have been placed at an imminent, immediate, and continuing increased risk of suffering, harm from fraud and identity theft. Plaintiffs and the Class must now take the time and effort and spend the money to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

---

[57] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.
[58] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

169. Plaintiffs and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

a. Trespass, damage to, and theft of their personal property including Personal Information;

b. Improper disclosure of their Personal Information;

c. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Personal Information being placed in the hands of criminals and having been already misused;

d. The imminent and certainly impending risk of having their Personal Information used against them by spam callers to defraud them;

e. Damages flowing from Defendant's untimely and inadequate notification of the data breach;

f. Loss of privacy suffered as a result of the Data Breach;

g. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

h. Ascertainable losses in the form of deprivation of the value of patients' personal information for which there is a well-established and quantifiable national and international market;

i. The loss of use of and access to their credit, accounts, and/or funds;

j. Damage to their credit due to fraudulent use of their Personal Information; and

k. Increased cost of borrowing, insurance, deposits and other items which are adversely affected by a reduced credit score.

170. Moreover, Plaintiffs and Class Members have an interest in ensuring that their information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard and statutorily compliant security

measures and safeguards. Defendant has shown itself to be incapable of protecting Plaintiffs' and Class Members' Personal Information.

171. Plaintiffs and Class Members are desperately trying to mitigate the damage that Defendant has caused them but, given the Personal Information Defendant made accessible to hackers, they are certain to incur additional damages. Because identity thieves have their Personal Information, Plaintiffs and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with this change.[59]

172. None of this should have happened. The Data Breach was preventable.

### I. Defendant Could Have Prevented the Data Breach but Failed to Adequately Protect Plaintiffs' and Class Members' Personal Information

173. Data breaches are preventable.[60] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[61] he added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[62]

174. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[63]

***Defendant Failed to Adhere to FTC Guidelines***

[59] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.
[60] Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012)
[61] *Id.* at 17.
[62] *Id.* at 28.
[63] *Id.*

175. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

176. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[64] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[65]

177. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

178. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

64

65 *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jan. 19, 2022).

179. Defendant failed to properly implement basic data security practices, including those set forth by the FTC.

180. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

***Defendant Fails to Comply with Industry Standards***

181. As shown above, experts studying cybersecurity routinely identify entities that collect sensitive information as being particularly vulnerable to cyberattacks because of the value of the Personal Information which they collect and maintain.

182. Several best practices have been identified that at a minimum should be implemented by large financial entities like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

183. Other best cybersecurity practices that are considered industry-standard include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

184. Defendant failed to meet the minimum standards of any of the following frameworks: NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

185. These foregoing frameworks are existing and applicable industry standards,

particularly for large financial entities. Defendant, however, failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

186. The mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Personal Information was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure Plaintiffs' and Class Members' Personal Information from those risks left that information in a dangerous condition.

187. Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*: (i) recklessly and/or negligently failing to take adequate and reasonable measures to ensure that its business email accounts were protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' Personal Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

## V. CLASS ACTION ALLEGATIONS

188. Plaintiffs incorporate by reference all allegations of the preceding paragraphs 1 through 187 as though fully set forth herein.

189. Plaintiffs bring all claims as class claims under Federal Rule of Civil Procedure 23. Plaintiffs assert all claims on behalf of the Class, defined as follows:

> All persons residing in the United States whose personal information was compromised as a result of the Barrett-Jackson Data Breach that occurred in November of 2024.

190. Plaintiffs reserve the right to amend the above definitions or to add subclasses in subsequent pleadings and motions for class certification.

191. The proposed Nationwide Class (collectively referred to herein as the "Class" unless otherwise specified) meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

192. **Numerosity:** The proposed Class is believed to be so numerous that joinder of all members is impracticable.

193. **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured through Defendant's uniform misconduct. The same event and conduct that gave rise to Plaintiffs' claims are identical to those that give rise to the claims of every other Class Member because Plaintiffs and each member of the Class had their sensitive Personal Information compromised in the same way by the same conduct of Defendant.

194. **Adequacy:** Plaintiffs are adequate representative of the Class because their interests do not conflict with the interests of the Class that they seek to represent; Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

195. **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and

provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

196. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a. Whether Defendant engaged in the wrongful conduct alleged herein;

b. Whether Defendant failed to adequately safeguard Plaintiffs' and the Class's Personal Information;

c. Whether Defendant's email and computer systems and data security practices used to protect Plaintiffs' and Class Members' Personal Information violated the FTC Act, state laws and/or Defendant's other duties discussed herein;

d. Whether Defendant owed a duty to Plaintiffs and the Class to adequately protect their Personal Information, and whether it breached this duty;

e. Whether Defendant knew or should have known that its computer and network security systems and business email accounts were vulnerable to a data breach;

f. Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach;

g. Whether Defendant breached contractual duties owed to Plaintiffs and the Class to use reasonable care in protecting their Personal Information;

h. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without

unreasonable delay, and whether this caused damages to Plaintiffs and the Class;

i. Whether Defendant continues to breach duties owed to Plaintiffs and the Class;

j. Whether Plaintiffs and the Class suffered injury as a proximate result of Defendant's negligent actions or failures to act;

k. Whether Plaintiffs and the Class are entitled to recover damages, equitable relief, and other relief;

l. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs and members of the Class and the general public;

m. Whether Defendant's actions alleged herein constitute gross negligence; and

n. Whether Plaintiffs and Class Members are entitled to punitive damages.

## VI. CAUSES OF ACTION

### COUNT ONE – NEGLIGENCE

197. Plaintiffs incorporate by reference all allegations of the preceding paragraphs 1 through 196 as though fully set forth herein.

198. Defendant solicited, gathered, and stored the Personal Information of Plaintiffs and the Class as part of the operation of its business and in order to gain profits.

199. Upon accepting and storing the Personal Information of Plaintiffs and Class Members, Defendant undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care to secure and safeguard that information and to use secure methods to do so.

200. Defendant had full knowledge of the sensitivity of the Personal Information, the types of harm that Plaintiffs and Class Members could and would suffer if the Personal Information was wrongfully disclosed, and the importance of adequate security.

201. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices on the part of Defendant. Plaintiffs and Class Members had no ability to protect their Personal Information that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiffs and the Class.

202. Further, as an employer, Defendant had a special relationship with Plaintiffs and the Class under Arizona law. *See e.g. Cal-Am Props. Inc. v. Edais Eng'g Inc.*, 253 Ariz. 78, 81, 509 P.3d 386, 389 (2022).

203. Defendant was well aware of the fact that cyber criminals routinely target large corporations through cyberattacks in an attempt to steal sensitive personal information.

204. Defendant owed Plaintiffs and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

205. Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures also have recognized the existence of a specific duty to reasonably safeguard personal information.

206. Defendant had duties to protect and safeguard the Personal Information of Plaintiffs and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive Personal Information. Additional duties that Defendant owed Plaintiffs and the Class include:

a. To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, email accounts, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class Members' Personal Information was adequately secured from impermissible release, disclosure, and publication;

b. To protect Plaintiffs' and Class Members' Personal Information in its possession by using reasonable and adequate security procedures and systems;

c. To implement processes to quickly detect a data breach, security incident, or intrusion involving its business email system, networks and servers; and

d. To promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Personal Information.

207. Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the Personal Information that Plaintiffs and the Class had entrusted to it.

208. Defendant breached its duty of care by failing to adequately protect Plaintiffs' and Class Members' Personal Information. Defendant breached its duties by, among other things:

a. Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the Personal Information in its possession;

b. Failing to protect the Personal Information in its possession by using reasonable and adequate security procedures and systems;

c. Failing to adequately and properly audit, test, and train its employees to avoid phishing emails;

d. Failing to use adequate email security systems, including industry standard SPAM filters, DMARC enforcement, and/or Sender Policy Framework enforcement to protect against phishing emails;

e. Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Personal Information;

f. Failing to adequately train its employees to not store Personal Information in their email inboxes longer than absolutely necessary for the specific purpose that it was sent or received;

g. Failing to consistently enforce security policies aimed at protecting Plaintiffs' and the Class's Personal Information;

h. Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

i. Failing to promptly notify Plaintiffs and Class Members of the Data Breach that affected their Personal Information.

209. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

210. As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

211. Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Personal Information of Plaintiffs and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use

reasonable care to adequately protect and secure the Personal Information of Plaintiffs and Class Members while it was within Defendant's possession and control.

212. Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiffs and Class Members, Defendant prevented Plaintiffs and Class Members from taking meaningful, proactive steps toward securing their Personal Information and mitigating damages.

213. As a result of the Data Breach, Plaintiffs and Class Members have spent time, effort, and money to mitigate the actual and potential impact of the Data Breach on their lives, including but not limited to, responding to fraudulent activity, closely monitoring bank account activity, and examining credit reports and statements sent from providers and their insurance companies.

214. Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

215. The damages Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

216. In addition to its duties under common law, Defendant had additional duties imposed by statute and regulations, including the duties under the FTC Act. The harms which occurred as a result of Defendant's failure to observe these duties, including the loss of privacy, lost time and expense, and significant risk of identity theft are the types of harm that these statutes and regulations intended to prevent.

217. Defendant violated these statutes when it engaged in the actions and omissions alleged herein, and Plaintiffs' and Class Members' injuries were a direct and proximate result of Defendant's violations of these statutes. Plaintiffs therefore are entitled to the evidentiary presumptions for negligence *per se*.

218. Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant owed a duty to Plaintiffs and the Class to provide fair and adequate computer systems and data security to safeguard the Personal Information of Plaintiffs and the Class.

219. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Personal Information. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

220. Defendant gathered and stored the Personal Information of Plaintiffs and the Class as part of its business of soliciting and facilitating its services to its clients, which affect commerce.

221. Defendant violated the FTC Act by failing to use reasonable measures to protect the Personal Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

222. Defendant breached its duties to Plaintiffs and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class Members' Personal Information, and by failing to provide prompt and specific notice without reasonable delay.

223. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

224. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.

225. Defendant breached its duties to Plaintiffs and the Class under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's Personal Information.

226. Defendant breached its duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiffs and the Class.

227. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

228. The injury and harm that Plaintiffs and Class Members suffered (as alleged above) was the direct and proximate result of Defendant's negligence.

229. Plaintiffs and the Class have suffered injury and are entitled to actual and punitive damages in amounts to be proven at trial.

**COUNT TWO – UNJUST ENRICHMENT**

230. Plaintiffs incorporate by reference all allegations of the preceding paragraphs 1 through 196 as though fully set forth herein.

231. Plaintiffs and the Class bring this claim in the alternative to all other claims and remedies at law.

232. Through and as a result of Plaintiffs' and Class Members' use of Defendant's auction services, Defendant received monetary benefits.

233. Defendant collected, maintained, and stored the Personal Information of Plaintiffs and Class Members and, as such, Defendant had direct knowledge of the monetary benefits conferred upon it by Plaintiffs' and Class Members' use of Defendant's services.

234. Defendant, by way of its affirmative actions and omissions, including its knowing violations of its express or implied contracts with Plaintiffs and Class Members, knowingly and deliberately enriched itself by saving the costs it reasonably and contractually should have expended on FTC and industry standard compliance and reasonable data privacy and security measures to secure Plaintiffs' and Class Members' Personal Information.

235. Instead of providing a reasonable level of security, training, and protocols that would have prevented the Data Breach, as described above and as is common industry practice among companies entrusted with similar Personal Information, Defendant, upon information and belief, instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiffs and Class Members.

236. As a direct and proximate result of Defendant's decision to profit rather than provide adequate data security, Plaintiffs and Class Members suffered and continue to

suffer actual damages, including (i) the amount of the savings and costs Defendant reasonably and contractually should have expended on data security measures to secure Plaintiffs' Personal Information, (ii) time and expenses mitigating harms, (iii) diminished value of Personal Information, (iv) loss of privacy, (v) harms as a result of identity theft; and (vi) an increased risk of future identity theft.

237. Defendant, upon information and belief, has therefore engaged in opportunistic, unethical, and immoral conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiffs and the Class in direct violation of Plaintiffs' and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its wrongful conduct.

238. Accordingly, Plaintiffs and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiffs and the Class.

**COUNT THREE – BREACH OF IMPLIED CONTRACT**

239. Plaintiffs incorporate by reference all allegations of the preceding paragraphs 1 through 196 as though fully set forth herein.

240. When Plaintiffs and the Class Members provided their Personal Information to Defendant when seeking employment or auction related services, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect Plaintiffs' and Class Members' Personal Information and to timely notify them in the event of a data breach.

241. Defendant required Plaintiffs and Class Members to provide, or authorize the transfer of, their Personal Information in order for them to obtain employment or receive Defendant's services.

242. Based on the implicit understanding, Plaintiffs and the Class accepted Defendant's offers and provided Defendant with their Personal Information.

243. Plaintiffs and Class Members would not have provided their Personal Information to Defendant had they known that Defendant would not safeguard their Personal Information, as promised, or provide timely notice of a data breach.

244. Plaintiffs and Class Members fully performed their obligations under their implied contracts with Defendant.

245. Defendant breached the implied contracts by failing to safeguard Plaintiffs' and Class Members' Personal Information and by failing to provide them with timely and accurate notice of the Data Breach.

246. The losses and damages Plaintiffs and Class Members sustained (as described above) were the direct and proximate result of Defendant's breach of its implied contracts with Plaintiffs and Class Members.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including actual damages, restitution, attorney fees, expenses, costs, and such other and further relief as is just and proper.

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

i. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks,

penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

iii. Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

iv. Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

v. Ordering that Defendant cease transmitting Personal Information via unencrypted email;

vi. Ordering that Defendant cease storing Personal Information in email accounts;

vii. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

viii. Ordering that Defendant conduct regular database scanning and securing checks;

ix. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

x. Ordering Defendant to meaningfully educate its current, former, and prospective employees and subcontractors about the threats faced as a result of the loss of financial and personal

information to third parties, as well as the steps they must take to protect against such occurrences;

d. An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

f. An award of such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED: January 9, 2026

*/s/ Andrew J. Shamis*
Andrew J. Shamis
(AZ Bar No. 037343)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
ashamis@shamisgentile.com

A. Brooke Murphy*
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
Telephone: (405) 389-4989
abm@murphylegalfirm.com

Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
raina@straussborrelli.com

*Interim Co-Lead Class Counsel*

John J. Nelson*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel.: (858) 209-6941
jnelson@milberg.com

Gerald D. Wells, III*
**LYNCH CARPENTER, LLP**
1133 Penn Ave, 5th Floor
Pittsburgh, PA 15222
T: 412-322-9243
anasuya@lcllp.com
jerry@lcllp.com

*Other Counsel for Plaintiffs and the Proposed Class*

**Pro Hac Vice application to be submitted*

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2026, I electronically filed the foregoing document(s) using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ Andrew Shamis*